Thomas Hutchinfon, Efqr., Chief Juftice.

John Cufhing,
Peter Oliver,    } Efqrs., Juftices.

1764.

ALLISON
v.
COCKRAN.

Rec. 1764.
Fol. 103.

Adminif-
trators are in-
competent
Witneffes in
Matters af-
fecting the
Eftate of
their Intef-
tate, except
where fuch
Eftate is in-
folvent.

The Re-
port of the
Commiffion-
ers is the only
legal Evi-
dence of fuch
Infolvency

———◆———

Allifon *verf.* Cockran.

**T**ROVER* for a Negro. (1)   The Adminiftra-
trix of one Cockran, (Father-in-Law to the
Defendant,)

* *Qu.* if this Action is well brought, for Trover lies not for a Negro.
2 Salk. 666.  Ld. Raym. 1274, 146.  Cafes in the Time of Holt, 495.

———————

(1) In 1677, the Court of King's Bench, confifting of *Rainsford, C.
J., Twifden, Wild & Jones, JJ.*, expreffed an opinion that trover would
lie for negroes, who had been found, by fpecial verdict, to be " infidels,"
and " ufually bought and fold in America," [or, as other reporters
have it, " in India,"] " as merchandife, by the cuftom of merchants."
*Butts* v. *Penny*, 2 Lev. 201 ; 3 Keb. 785 ; Freem. 452.  But the record
fhows that the negroes in that cafe were " in India ;" 20 Howell's
State Trials, 52 ; and the decifion, as reported by Freeman, was put
upon

Defendant,) deceaſed, was offered as an Evidence to prove the Sale from Alliſon to the Father.

*Ruled*

which can eſtabliſh the Competency of the Adminiſtrator.

Whether Trover lies for a Negro—*quære.*

upon that ground only—"Held *per Curiam*, that although by the law with us a man cannot have an abſolute property in the body of another, yet the cuſtom of India concerning buying and ſelling of ſlaves being found, a trover and converſion would lie well enough." Freem. 452. This does not appear to have been known to the ſucceſſors of thoſe judges, (Freeman's Reports not being yet publiſhed,) when they "denied the opinion in the caſe of *Butts & Penny*." 2 Ld. Raym. 1275.

In the ſame court in 1680, *Dolben, J.*, ſaid that trover, brought by one tenant in common "for half a negro," "has been allowed." 2 Show. 177. But it does not appear where that negro was. The deciſion referred to may have been in *Butts* v. *Penny, ub. ſup.*, which is reported by Keble as "trover of 10 negroes and a half;" 3 Keb. 785; (although the record of that caſe only mentions ten; 20 Howell's State Trials, 51, note;) or, more probably, the caſe thus quoted in the Court of Chancery in 1687: "*Mr. Sergeant Maynard's caſe* was cited, who recovered a debt contraɛted here againſt the executor of an owner of a plantation in Barbadoes, and by his advice an aɛtion of trover was brought, and judgment obtained for the fourth part of a negro." 1 Vern. 453.

In 1689, Lord *Holt, & Rokeby & Turton, JJ.*, (three of the four judges who afterwards decided *Chamberlain* v. *Harvey, infra,*) joined in an opinion, given to the King and Council, that negroes were merchandiſe in the colonies. 1 Burge Col. & For. Laws, 736, note.

It is ſaid to have been afterwards adjudged in the Common Bench that trover will lie for negroes. *Gelly* v. *Cleve*, (1693,) 1 Ld. Raym. 147, *ex rel.* Place. 3 Lev. 337. But it muſt be preſumed that thoſe negroes too were in the colonies; for if they were in England, the deciſion is inconſiſtent with a ſeries of caſes in the King's Bench, (cited in Quincy's note, *ſupra*, 94,) by which it was very ſoon afterwards eſtabliſhed as the law of England, that "as ſoon as a negro comes into England, he becomes free; one may be a villein in England, but not a ſlave." 2 Salk. 666; Caſ. temp. Holt, 495.

In thoſe caſes, it was held, that treſpaſs would not lie for taking a negro in England, without declaring (as in the caſe of the taking away of any other ſervant) *per quod ſervitium amiſit*; *Chamberlain* v. *Harvey*, (1696,) 1 Ld. Raym. 146; 3 Ib. 129; 5 Mod. 182, 186; Carth. 397: Nor *indebitatus aſſumpſit* for the price of a negro, without averring that at the time of the ſale he was in a country by the laws of which he might be ſold as a chattel; *Smith* v. *Brown*, 2 Salk. 666; Caſ. temp. Holt, 495: Nor trover. *Smith* v. *Gould*, (1706,) 2 Ld.

· _Ruled by the Court,_ (after hearing the Arguments of _Meſſrs. Gridley, Otis & Auchmuty, pro & con,_) that
Adminiſtrators

Ld. Raym. 1274; 2 Salk. 666. That the converſion alleged in the laſt caſe was in England is manifeſt from the grounds given for the deciſion by Lord _Holt_ — " The common law takes no notice of negroes being different from other men. By the common law no man can have a property in another, but in ſpecial caſes, as in a villein," &c. " There is no ſuch thing as a ſlave by the law of England." 2 Ld. Raym. 1274, 1275. The ſtatement at the end of Salkeld's report of this caſe — " the Court ſeemed to think that in treſpaſs _quare captivum ſuum cepit_ the plaintiff might give evidence that the party was his negro and he bought him " — appears to be an unwarranted inference of the reporter, inconſiſtent with Lord Raymond's report, and with the caſe of _Chamberlain_ v. _Harvey, ub. ſup._

There is no Engliſh adjudication ſince, which confliƈts with theſe deciſions of Lord _Holt._ In _Pearne_ v. _Liſle,_ (1749,) Ambl. 75, Lord _Hardwicke_ refuſed a writ of _ne exeat_ againſt one who owed the plaintiff for the hire of certain negroes, upon the ground that it was a legal demand on which the defendant might be arreſted at law, ſaying : " As to the nature of the demand, it is for the uſe of negroes ; a man may hire the ſervant of another, whether he be a ſlave or not, and will be bound to ſatisfy the maſter for the uſe of him." This paſſage accords with the ſuggeſtion in _Chamberlain_ v. _Harvey, ub. ſup._, that treſpaſs _per quod ſervitium amiſit_ might be maintained in England for enticing away a ſlave ; and concluſively ſhows that, even if the writ of _ne exeat_ had been granted, the caſe would have involved no deciſion of the queſtion of what property one might have in a negro. The additional remark of the Lord Chancellor — " I have no doubt that trover will lie for a negro ſlave ; it is as much property as any other thing " — is therefore wholly extrajudicial ; and is moreover accompanied by a miſrepreſentation of the grounds of Lord _Holt's_ deciſion, and by a manifeſt deſire to confirm the opinion given by Lord _Talbot_ and himſelf in 1729 as attorney and ſolicitor general, in favor of holding ſlaves in England, of which Lord _Mansfield_ ſaid that it " was upon a petition in Lincoln's Inn Hall, after dinner ; probably, therefore, might not be taken with much accuracy." Lofft, 8 ; 20 Howell's State Trials, 70.

Lord _Hardwicke's_ opinion on this ſubjeƈt has never been recognized as law by any court in England. In 1762, a bill in equity, filed by an adminiſtrator to recover back money given by his inteſtate to a negro who had been brought to England as a ſlave, (which was apparently founded on the ſuppoſition that the negro was ſtill a ſlave, and therefore
                                                                        incapable

Adminiſtrators could not be Witneſſes, except when the Eſtate is inſolvent.

*Meſſrs.*

incapable of receiving a gift,) was diſmiſſed by Lord *Northington,* who ſaid: " As ſoon as a man ſets foot on Engliſh ground, he is free; a negro may maintain an action againſt his maſter for ill uſage, and may have a *habeas corpus* if reſtrained of his liberty." *Shanley* v. *Harvey,* 2 Eden, 127.

It appears by *Granville Sharp's* MS. that Lord C. J. *Wilmot,* in 1768, held, that a female negro ſlave, married in England to a negro man who had alſo been brought from the Weſt Indies as a ſlave, could not be carried back without the conſent of the huſband; and that Lord C. J. *De Grey,* about the ſame time, more than once expreſſed the opinion, that there could be no property in the perſon of a ſlave by the law of England. Sharp's Memoirs, (2d ed.) 72, 110. The ſame book contains a full account of Lord *Mansfield's* evaſions of a deciſion of the general queſtion in the caſe of *Rex* v. *Stapylton,* in 1771. Ib. 82, 89–92.

It is clear from theſe authorities, (without relying on the caſe of the *Ruſſian Slave* in 1569, mentioned in 2 Ruſhw. Hiſt. Coll. 468,) that Lord *Mansfield's* reluctant diſcharge of the *Negro Sommerſett* in 1772, (Lofft, 17–19; 20 Howell's State Trials, 79–82,) was but a re-affirmance of the law of England, as previouſly determined by Lord *Holt* and other eminent judges — notwithſtanding the ſubſequent ſtatement of Lord *Mansfield,* in *The King* v. *Thames Ditton,* (1785,) 4 Doug. 301, that " the caſe of *Sommerſett* is the only one on this ſubject; " and the aſſertion of Lord *Stowell,* in the caſe of the *Slave Grace,* (1827,) 2 Hagg. Adm. R. 106, 114, that Lord *Mansfield,* in *Sommerſett's caſe,* " made a change in the law." For an examination of ſome of the *obiter dicta* of Lord *Stowell,* ſee 20 Law Rep. 99, 105–107. That learned civilian does not maniſeſt any knowledge that one of his predeceſſors, Sir *George Hay,* almoſt as ſoon as *Sommerſett's caſe* was decided, twice held, upon full argument, that, before as well as ſince that deciſion, negroes could not lawfully be held or ſold as ſlaves in England. *Cay* v. *Crichton,* (1773,) in the Prerogative Court; *Rogers* v. *Jones,* (1776,) in the High Court of Admiralty; both reported in Granville Sharp's " Juſt Limitation of Slavery," (London, 1776,) App. 10 & 11, pp. 77–86.

Sir *William Blackſtone's* oſcillations in this matter are too characteriſtic to be paſſed by, notwithſtanding the length to which this note has already extended. In the firſt edition of his Commentaries, publiſhed in 1765, founding himſelf upon Lord *Holt,* (" Salk. 666,") he wrote: " This ſpirit of liberty is ſo deeply implanted in our Conſtitution and rooted in our very ſoil, that a ſlave or a negro, the moment he lands in England, falls under the protection of the laws, and, with regard to all

1764.

ALLISON
*v.*
COCKRAN.

*Meffrs. Otis & Gridley*, Council for Defendant, faid it was univerfally known that the Eftate of Cockran, the Father, was infolvent, and appealed to the Chief Juftice (who was likewife Judge of Probate) (2) for the Truth of their Suggeftion.

The

---

all natural rights, becomes *eo inftanti* a freeman." In his third edition, publifhed in 1768, after the queftion had begun to be re-agitated in England, he altered the laft claufe of his ftatement to this : " and fo far becomes a free man; though the mafter's right to his fervice may probably ftill continue." Againft which Quincy has written, in the margin of his copy, " Curious ! " In the fourth edition, publifhed two years later, "*poffibly*" was fubftituted for " probably." 1 Bl. Com. 127. After the paffage had affumed this fhape, Hargrave truly faid of it, " There appears to be fomewhat of very fubtle diftinction, if not rather of contradiction." 20 Howell's State Trials, 30, note.

Trefpafs will lie in England for taking flaves on the high feas, or in a country where flavery is not prohibited by law, from one who is not prohibited by the laws of his own country from trading in flaves. *Madrazo* v. *Willes*, (1820,) 3 B. & Ald. 353. *Buron* v. *Denman*, (1848,) 2 Exch. 167. But the commander of a Britifh veffel is not liable to an action for refufing to deliver up to their mafter flaves who have efcaped from a foreign country where flavery is recognized by law, and got on board his veffel, and are unwilling to return. *Forbes* v. *Cochrane*, (1824,) 2 B. & C. 448 ; 3 D. & R. 679.

By the Englifh authorities, therefore, the right to maintain trover for a negro would feem to depend upon the queftion whether he may be held and fold as a chattel by the law of the country where his mafter's poffeffion of him is interfered with. The fact fuggefted by Hargrave, *arguendo*, in 20 Howell's State Trials, 53, that " the mafter's power over the flave doth not extend to his life, and confequently the mafter's property in the flave is in fome degree qualified and limited," would feem to be no valid objection to the maintenance of the action; for trover lies by one who has any fpecial property in a chattel, with the right to immediate poffeffion. 2 Saund. 47, & note.

At the time of the trial of the cafe here reported by Quincy, negro flaves were held and fold as property in Maffachufetts. *Ante*, 29, note (2) to *Oliver* v. *Sale*, and authorities there cited. And in 1763 trover had been maintained in this court for a negro. *Goodfpeed* v. *Gay*, in Barnftable, Rec. 1763, fol. 47. But it has been faid, that in Connecticut, while flavery exifted there, trover would not lie for a flave. Reeve Dom. Rel. 340.

(2) By the Province Charter the jurisdiction in matters of probate

was

ALLISON
*v.*
COCKRAN.

The *Ch. Juſt.* ſaid that from the Accounts given him of the Eſtate, and from his own Knowledge, he had no Manner of Doubt but that the Eſtate was inſolvent; yet as the Commiſſioners had not made Report, there was no legal Evidence of the Inſolvency. And *the Court ruled*, that the Adminiſtratrix of Cockran the Defendant's Father ſhould not be ſworn. (3)

(3) It is not eaſy to ſee why an adminiſtrator, not a party to the ſuit, and without any beneficial intereſt in the truſt fund, ſhould not be a competent witneſs for the eſtate, without regard to its ſolvency or inſolvency. 2 Stark. Evid. (2d Amer. ed.) 775.    3 Dane Ab. 420.    12 Maſs. 358. But it is probable that, in practice, adminiſtrators were paid by a commiſſion on the amount collected, as was afterwards expreſsly provided by the Rev. Sts. c. 67, § 8 — which might require a releaſe to make them competent witneſſes.    11 S. & R. 208.    15 Ib. 235.    7 Ib. 116.    See alſo 16 Maſs. 118.

